# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN DOAN, et al., | Case No. 1:13-cv-00531-LJO-SMS |
| Plaintiffs, | **ORDER ON DEFENDANTS' MOTIONS TO DISMISS AND MOTIONS TO STRIKE** (Docs. 25, 27) |
| v. | |
| NIRMAL SINGH, et. al., | |
| Defendants. | |

## INTRODUCTION

Plaintiffs Kevin and Pauline Doan ("Plaintiffs") filed a First Amended Complaint (FAC) on July 15, 2013. Doc. 20. Before the Court are Defendants' motions to dismiss. Docs. 25 & 27. Although Plaintiffs state fewer claims (17 reduced to 13), the FAC has grown (from 43 pages to 54 pages) and contains an immense number of exhibits (there were 8 to the complaint plus 39 to the opposition to the motions to dismiss; there are 62 to the FAC and 20 to the opposition to the motion to dismiss the FAC). The list of defendants also continues to grow, to nine individuals and seven business entities.[1] Otherwise, the FAC remains what this Court previously called "a litany of factual allegations that are confusing and disorganized at best." The allegations are not chronological, they

---

[1] Of the nine individuals, four were first named in Plaintiffs' nearly-identical lawsuit in California Superior Court: (1) Nirmal Singh ("Singh"), (2) Paul Raj Chadha ("Chadha"), (3) Gurdev Singh Teer ("Gurdev"), and (4) Ranjeet Singh ("Ranjeet"). Plaintiffs' previous complaint in this case also named (5) Nachhattar Singh Chandi and (6) Susan Chandi ("the Chandis"), as well as (7) Prabhjot Singh ("Prabhjot") and (8) Jaswinder Kaur ("Kaur"). Finally, the present FAC adds (9) Sandeep Turna ("Sandeep"). The FAC also refers to a tenth defendant, Rigoberto Galvan, but not in the caption.
 The cast of business entities has similarly expanded to seven. In the Superior Court litigation, the defendant organizations included (1) KS Chandi & Sons, Inc. ("Chandi & Sons"); (2) Watsonville Petroleum, Inc. ("Watsonville, Inc."); (3) Chadha Construction; (4) AASRA Petroleum, Inc. ("AASRA"); and (5) JPH LLC ("JPH"). The first federal complaint added (6) Chandi Brothers, LLC ("Chandi Brothers"). The FAC adds (7) Mid Valley Services, Inc. The FAC actually mentions two separate companies named "Mid Valley," and it is unclear which one is intended.

rarely involve the Plaintiffs (or most Defendants), and they are incomplete without reference to dozens of exhibits and complaints filed in other cases.

This Order will focus only on one sufficient cause for dismissal, the FAC's failure to allege grounds for federal subject matter jurisdiction. The parties are not diverse, and the one federal claim—a violation of RICO, 18 U.S.C. §1962—is inadequately pled. Because the Court must dismiss the RICO claim, it must dismiss the complaint for lack of jurisdiction.

**BACKGROUND**

**A.     Allegations**

The following is a summary of the allegations in the FAC relating to Plaintiffs' RICO claim (FAC at ¶¶1-109). It does not include facts which are not pled in relation to the RICO claim (FAC at ¶¶110-231), nor does it include facts that are alleged for the first time in Plaintiffs' opposition to the motions to dismiss. Nor does this summary imply that the allegations are true. Rather, the Court generally assumes that allegations are true when considering a motion to dismiss. *Lazy Y. Ranch LTD v. Behrens,* 546 F.3d 580, 588 (9th Cir. 2008).

Defendant Singh is a franchise developer for Arco AM PM gas station/convenience stores. FAC at ¶¶24, 38-39. By 2006, he and his brother and sister-in-law, the Chandis, were co-owners of two companies, Chandi & Sons and Chandi Brothers, which in turn owned several AM PMs. *Id*.

On several occasions, Singh entered the companies into transactions without disclosing the Chandis' co-ownership. First, in 2006, Singh withheld this detail from two outside investors (nonparties Gill and Dhaliwal) who purchased shares in the companies. (In more general terms, the FAC asserts that the Chandis, too, concealed this fact from the investors.) FAC at ¶¶52-55. Then, in November of 2006, Singh and the Chandis "defrauded" the Altura Credit Union when they signed loan documents for the two businesses without having disclosed the existence of Gill and Dhaliwal as new shareholders who had supplied the money that would be the down payment for the loans. FAC at ¶56. Next, in federal tax returns for these two companies filed in 2007, 2008, and 2009, Singh and the Chandis "did not report" the two investors' 50% ownership share, and instead claimed to hold the company amongst themselves. FAC at ¶¶57-61. (The Court observes that the

FAC is partially mistaken. Beginning in 2008, these tax returns actually assert that Singh was the sole owner of Chandi & Sons and the sole equity holder in Chandi Brothers. Ex. 5-9.)

The FAC describes a variety of other bad acts. In 2008, Singh "coerced his partners" to accept a fraudulent loan for an AM PM in Highlands, California. However, the complaint does not identify these "partners." FAC at ¶59. Singh and the Chandis also "created fraudulent corporate documents." This refers to corporate minutes from March 2010 which, on their face, describe a transaction in which Singh bought the Chandis' shares in the companies; in exchange, the Chandis acquired from the businesses an AM PM on Mitchell Road (the "Mitchell AM PM"). Ex. 10 and 11. According to the FAC, this transaction never in fact occurred: the Chandis remained corporate officers, and the Mitchell AM PM remained an asset of the companies. FAC at ¶¶62-67.

Singh later obtained more loans which were "fraudulent" in that he presented the banks with fake invoices for costs he had not actually incurred. To conceal this deceit, Singh created his own sham company, "Chadha Construction, Inc.," not to be confused with a real company owned by Mr. Chadha, "Chadha Construction." In 2010 and 2011, he obtained three loans using this method. FAC at ¶¶68-73. In 2012, he used the same method to obtain another loan which he invested in three other AM PMs. FAC at ¶79. In these activities, Singh did not involve the Chandis or their two co-owned businesses. Instead, he was assisted by Chadha, a building contractor.

Nevertheless, Chadha's involvement in these activities is barely pled. He allegedly "colluded" in the 2012 fraud, though only vague allegations are made as to how he did so. Apparently he falsely claimed to have worked as the general contractor on the Lander AM PM project. FAC at ¶79. He also along with Singh "created false invoices," but the allegations as to how these were created relate to Singh. FAC at ¶69. Checks were then "sent" by Singh, Chadha, "and/or their companies," then "were deposited" into Singh's sham company and later "were funneled" by Singh and two other defendants—Kaur and Prabhjot—into their personal accounts. FAC at ¶79(d)(i). Separately, in 2012, Singh, Kaur, and Prabhjot obtained a loan for an AM PM in Roseville by submitting a falsified bank statement and by relying on false invoices prepared by Chadha. FAC at ¶80. Similarly, Singh, Kaur, Prabhjot, and Chadha allegedly colluded to use the bank accounts of both "Chadha Construction" companies to "funnel" money into their personal

accounts while "defrauding" banks and investors. ¶79(d)(vii). Once again, however, the FAC and exhibits focus mainly on Singh. As part of his loan application, Singh presented some checks written from his account to Chadha's construction company for work on various AM PMs (including Plaintiffs' at Watsonville, described below). In his application, Singh misled the bank into believing he had written these checks to his sham "Chadha" company for a different AM PM.

Plaintiffs first appear in the FAC in 2011. FAC at ¶74. They and another investor, Harpreet Dhaliwal, entered into a joint venture agreement with Singh to develop a new AM PM in Watsonville. The FAC does not describe this agreement in much detail, but it is attached as an exhibit and generally provided that Plaintiffs (the Doans) would lend money for the purchase of land in exchange for a stake in the new AM PM. Ex. 56. Later, almost parenthetically, the FAC alludes to a second joint venture agreement by which Plaintiffs loaned money for development of the "Hatch AM PM" in Ceres in exchange for future payments and stakes in Chandi & Sons and Chandi Brothers. (The nature of these stakes is unclear. The contract refers once to "50% of Nirmal Singh's shares" in these companies, later to "his fifty percent (50%) of his shares," and later to a sale of 50% of the stock in "the Hatch AM/PM only.") FAC at ¶92; Ex. 58.

In 2012, Singh and the Chandis obtained another loan from Wells Fargo for their companies, Chandi & Sons and Chandi Brothers, to develop additional AM PMs. FAC at ¶¶65-67. By this time, Plaintiffs were 50% shareholders of the companies. Nevertheless, Singh presented the bank with the fraudulent minutes from 2010,[2] omitted to inform the bank that the companies did in fact own the Mitchell AM PM, and claimed that he owned 100% of both companies. (The exhibit shows that the bank questioned Singh's claim. Ex. 17.) However, no specific role is attributed to the Chandis, and in fact the FAC elsewhere alleges that the Chandis were by this point no longer shareholders in one or both of these companies, ¶¶67, 92 ("KS Chandi & Sons, where Defendants Singh and Plaintiffs Doan's [sic] were the only shareholders") or is ambivalent regarding their ownership, ¶159 ("Defendants the Chandi's may also be shareholders of said companies").[3]

---

[2] In their opposition, Plaintiffs allege that these fraudulent minutes were also part of a "process of duping the investors Plaintiffs the Doan by stating that Mitchell ARCO AM PM was not owned by KS Chandi & Sons and Chandi brothers and Chandis were not officers of KS Chandi & Sons or members of Chandi Brothers." But this allegation does not appear in the complaint. While the Court has accommodated Plaintiffs' frequent reliance on exhibits, the Court cannot consider allegations raised for the first time in the opposition.

4

Once construction was underway at Watsonville, Singh, Chadha, and their companies falsely represented to Plaintiffs that construction costs had increased, that a larger bank loan would be needed, and accordingly that Plaintiffs would need to provide more money. Plaintiffs characterize this request as "extortion." FAC at ¶76. Construction costs had not actually increased; rather, "Singh, [Kaur], Prabhjot, Gurdev, and Ranjeet while colluding with Defendant [Chadha] embezzled funds" from the Watsonville AM PM and from the Hatch AM PM in order to fund construction of the Ripon AM PM. FAC at ¶¶84, 89. However, allegations as to all defendants but Singh are insubstantial. Singh, Gurdev and Ranjeet were apparently the co-owners of the JPH and AASRA companies, which were building the AM PM in Ripon. These three defendants "colluded with each other" in transferring money from the Watsonville company and from KS Chandi & Sons to themselves or to JPH and AASRA, but only Singh's role is described in any detail. ¶¶89-90, 92.

On another occasion, Singh again attempted to obtain a "fraudulent" loan, this time submitting invoices relating to the Plaintiffs' Watsonville AM PM investment, again without any assistance from anyone else. Singh did not ultimately obtain this loan. FAC at ¶85. Finally, the FAC alludes to a mechanic's lien placed on the Watsonville AM PM by Chadha Construction. However, Plaintiffs do not attempt to explain the significance of this lien. FAC at ¶88.

Plaintiffs refused to pay the additional money demanded for the Watsonville project. Singh and Chadha stopped construction and allowed the AM PM to go into foreclosure. FAC at ¶70. On November 30, 2012, Plaintiffs and their co-investor Harpreet Dhaliwal filed a Superior Court case against Singh and others. Singh attempted to bribe Harpreet to drop his case, to not testify for Plaintiffs (the Doans), and to "get" the attorney for Plaintiffs to drop their case.[4] FAC at ¶98-100.

As damages, Plaintiffs claim their loss of equity in, and loss of future income from, the Watsonville, Mitchell, and Hatch AM PMs. They also claim their investments in the Watsonville AM PM and in the Chandi & Sons and Chandi Brothers companies. FAC at ¶109.

---

[3] In their opposition, Plaintiffs clarify that the 2006 investors Gill and Dhaliwal also remained 50% owners of both companies, and add that they had a $1.35 million senior lien on the Hatch AM PM. The allegation of a senior lien is entirely new. Again, the Court cannot consider allegations not raised in the complaint.
[4] The opposition attributes this interference to Mr. Chandi. Again, the Court cannot consider this new allegation.

5

**B. Procedural History**

In the Superior Court case, Plaintiffs and Harpreet Dhaliwal were represented by attorneys Lee Durst and Amanda Bui. Doc. 11-2. They named four individuals—Singh, Chadha, Gurdev, and Ranjeet—and several entities. On April 3 and 4, 2013, two related cases were filed in this Court against Singh and the Chandis. 1:13-cv-00484 and 2:13-cv-00663-MCE-DAD. In each of these three cases, Lee Durst represented a different group of plaintiffs.

The present case was initiated on April 13, 2013, when Plaintiffs Kevin and Pauline Doan by attorney Lee Durst filed a complaint with this Court. Doc. 1. Their federal complaint was virtually identical to their Orange County complaint, aside from the change in parties and minor revisions to the causes of action. Harpreet Dhaliwal was no longer a plaintiff, and there were additional defendants as identified above.

On June 20, 2013, this Court granted with leave to amend Defendants' motions to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Doc 18. On July 15, 2013, Plaintiffs filed a first amended complaint. Doc. 20. Two groups of defendants filed the instant motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on August 2, 2013 and August 6, 2013. Docs. 25 & 27. Plaintiffs filed an opposition on August 12, 2013. Doc. 30. Both groups of defendants filed replies on August 22 and August 24, 2013. Docs. 31, 32.

The Court found the motions suitable for a decision without oral argument, pursuant to Local Rule 230(g), and vacated the September 3, 2013, hearing date. Having considered the arguments presented and the relevant law, this Court issues this order.

**LEGAL STANDARDS**

**A.    Standard under Fed. R. Civ. P. 12(b)(6)**

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is a challenge to the sufficiency of the allegations set forth in the complaint. A Fed.R.Civ.P. 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing

6

the motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

To survive a Fed.R.Civ.P. 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell v. Twombly*, 550 U.S. 544, 570, (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility for entitlement to relief." *Id*. (citing *Twombly*, 550 U.S. at 557).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). Thus, "bare assertions ... amount[ing] to nothing more than a formulaic recitation of the elements ... are not entitled to be assumed true." *Iqbal*, 129 S.Ct. at 1951. A court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Farm Credit Services v. American State Bank*, 339 F.3d 764, 767 (8th Cir. 2003) (internal citation omitted). Moreover, a court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Marketing Ass'n v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998). In practice, "a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co*., 745 F.2d 1101, 1106 (7th Cir. 1984)).

**B.     Federal Question Jurisdiction**

The court has an independent obligation to inquire into its own subject matter jurisdiction. *See, e.g., Bova v. City of Medford*, 564 F.3d 1093, 1095 (9th Cir. 2009). Congress has conferred

7

subject matter jurisdiction on this Court for cases involving a federal question ("federal question jurisdiction") and for cases between citizens of different states ("diversity jurisdiction"). Diversity jurisdiction requires that the parties be citizens of different states and the amount in controversy exceed $75,000. 28 U.S.C. § 1332. The district court's federal question jurisdiction extends to "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The presence or absence of federal-question jurisdiction is governed by the well-pleaded complaint rule, which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Specifically, district courts have jurisdiction to hear "[o]nly those cases in which a well-pleaded complaint establishes either that [1] federal law creates the cause of action or that [2] the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Armstrong v. N. Mariana Islands*, 576 F.3d 950, 954-55.

**RICO**

"To state a claim for damages under RICO a plaintiff has two pleading burdens." *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983). First, the plaintiff must assert that the defendant has violated 18 U.S.C. § 1962, the substantive RICO statute. In the "prototypical" RICO offense, the defendant seizes control of an enterprise (or, less prototypically, allows the enterprise to continue its normal, lawful business), then uses the enterprise to commit criminal acts that he could not do himself. *United States v. Shamah*, 624 F.3d 449, 455 (7th Cir. 2010). Specifically, it must be alleged: (1) that the defendant, (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" [defined in 18 U.S.C. § 1961], (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962(a)–(c); *Town of W. Hartford v. Operation Rescue*, 915 F.2d 92, 100 (2d Cir. 1990).

The plaintiff's second "pleading burden" is to allege that this violation caused injury to his business or property. 18 U.S.C. § 1964(c); *Mendoza v. Zirkle Fruit Co.,* 301 F.3d 1163, 1168 (9th Cir.2002) (violation must be both the factual and proximate cause of the injury). Because the "mere

assertion of a RICO claim ... has an almost inevitable stigmatizing effect on those named as defendants, ... courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Figueroa Ruiz v. Alegria,* 896 F.2d 645, 650 (1st Cir.1990).

Defendants are alleged to have committed, conspired to commit, or aided and abetted (1) mail fraud, (2) wire fraud, (3) bank fraud, (4) embezzlement, (5) bribery, (6) witness tampering, and (7) intimidation. FAC at ¶105-7. The "use and delivery" of certain "forged exhibits" comprised the bank fraud, and delivery of other items via the US Mail was mail fraud. FAC at ¶97. Plaintiffs were harmed by the resultant "looting" of their companies and assets and the loss of their investments. FAC at ¶109.

## CAUSATION

Defendants argue that, even if they are assumed to have engaged in a pattern of racketeering, Plaintiffs fail to allege how these acts caused their alleged injuries.

**Undisclosed Senior Lienholder**

In their opposition, Plaintiffs respond that they suffered damages "when Defendants concealed material facts that Defendants had sold 50% of KS Chandi & Sons and Chandi Brothers to Gill and Dhaliwal who has [sic] a $1.35 million senior lien on the Hatch Arco AM PM. ... Should they foreclose, Plaintiffs will lose their investment in this station, lose their equity, lose their future income."

The FAC alleges that Gill and Dhaliwal invested in these companies in 2006, and there is a suggestion that they remained owners since this time. FAC at ¶54. And Plaintiffs' estimate of damages does include a loss of 50% equity in, and future revenue from, the Hatch AM PM. ¶109. But there is no mention in the FAC of a senior lien. Defendants cannot raise this asserted damage for the first time in the opposition.[5]

---

[5] In their reply brief, Defendants also argue that until the senior lienholders do foreclose, no cause of action has accrued. It is true that, until injuries become "concrete and actual," Plaintiffs do not state a claim under RICO. *Steele v. Hospital Corp. of America*, 36 F.3d 69, 71 (9th Cir.1994). On the other hand, Plaintiffs might have overpaid for an encumbered property. Plaintiffs do not explicitly refer to this injury. The Court will not speculate.

9

### "Looting" of Mitchell AM PM

There is no shareholder standing to assert RICO claims where the harm is derivative of harm to the corporation. *Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635, 640 (9th Cir. 1988). However, harm is direct, and not merely derivative, where the Plaintiffs can show an injury distinct from that to other shareholders. *Id*. In the FAC, Plaintiffs broadly allege that the assets of their companies (presumably Watsonville Inc., Chandi Brothers and Chandi & Sons) were "looted" by certain of the Defendants. FAC at ¶109. Responding to this vague allegation, Defendants argue that only the companies themselves have standing to sue for any "looting."

If the Chandis remained shareholders in their two companies, "looting" in favor of the Chandis would have a distinct impact on Plaintiffs, and they would have standing to sue. However, as noted above, the FAC is ambivalent as to whether the Chandis remained shareholders in these companies. Furthermore, the FAC does not clearly identify the alleged "looting." It is not until their opposition (or unrelated portions of the FAC) that Plaintiffs clarify that they are referring to the Mitchell AM PM. While the FAC allows an inference that Singh and the Chandis caused Plaintiffs to be deprived of the Mitchell AM PM, the FAC does not identify this as a loss or harm. Rather, the FAC presents Mr. Chandi's execution of the quitclaim deed simply as evidence that the 2010 minutes were fraudulently created; it presents these minutes as a means by which Singh deceived banks into giving loans. None of this impacted Plaintiffs.

### Witness Tampering and Intimidation

In their opposition, Plaintiffs allege that Mr. Chandi "threatened key witness Harpreet Dhaliwal to drop the case against Nirmal Singh and themselves." However, Plaintiffs allege no damages caused by this activity.

### Other Harms

Defendants in their motion to dismiss have identified several other harms that they believe are alleged in the FAC. Most plausibly, they note that, according to the FAC, Singh and Chadha caused the foreclosure of the Watsonville AM PM. Having mentioned this harm, they do not claim that the FAC failed to allege causation here. (Plaintiffs, in turn, do not mention this particular harm

10

in their opposition.) Assuming that individuals did engage in a RICO violation by "funneling" money from the Watsonville and Hatch projects, Plaintiffs have properly alleged causation.

**Conclusion**

Assuming that the Court reads the FAC liberally—interpreting the extremely opaque RICO claim through the lens of statements made outside the RICO claim and outside the FAC—Plaintiffs have properly alleged causation in two respects: as to the deprivation of the Mitchell AM PM (brought about by the quitclaim deed, attributable to the Chandis and Singh) and as to the foreclosure of the Watsonville AM PM and funneling of assets from the Hatch AM PM and its companies (brought about by Singh, Kaur, Prabhjot, Gurdev, Ranjeet, and Chadha). As explained above, however, the Court cannot consider facts towards the RICO claim that the FAC does not allege.

Even if the Court considers these improper statements, the claim nevertheless fails because it does not allege that these harms were caused by actual RICO violations.

### ENTERPRISE

The definition of "enterprise" includes a "union or group of individuals associated in fact although not a legal entity." 18 U.S.C.A. § 1961(4). Evidence of a "pattern of racketeering activity" does not itself constitute an enterprise. *United States v. Turkette*, 452 U.S. 576, 583 (1981). Rather, this is proved "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id*.

According to the FAC, the enterprise began in 2006 as an association-in-fact of Singh and the Chandis, who "built an empire through brilliant, sophisticated scheme of deceit, fraud, intimidation, misrepresentation, misuse of Corporations, securities fraud to defraud investors of Millions of Dollars of their hard earned money, to defraud banks and the US Government of Tens of Millions of Dollars through Federally insured and Government backed loans." They were later joined by Prabhjot, Chadha, Gurdev, and Ranjeet "who assisted in their fraud against investors and banks," and by Kaur, Rigoberto and Sandeep who "acted as their agents in carrying out the fraud." "As a group, they used Corporations to sell unregistered shares and nonexempt stocks when they had no intention of performing on their promises, created forged Corporate documents, bank

11

statements, false certification of payments and forged checks to defraud investors and banks alike." FAC at ¶¶39-40.

The FAC alleges a pattern of activity, but no facts of a formal or informal organization in which individuals function as a continuous unit. The FAC contains no allegations relating to Rigoberto, except to identify him as the co-owner with Chadha of Chadha Construction, and no specific allegations relating to Sandeep, except to identify him as the co-owner with Singh of Chadha Construction, Inc. The same is nearly true as well of Kaur, Prabhjot, Gurdev, and Ranjeet. While it is generally asserted that Kaur and Prabhjot obtained a fraudulent loan and participated with Singh in "funneling" money, no specific allegations are made showing how these individuals associated with other individuals in any sustained fashion, let alone showing how they performed these acts. As stated above, even Chadha's connection to Singh is tenuous. Only the name, "Chadha Construction, Inc.," links him to Singh's sham company. Otherwise, few allegations are made regarding Chadha. Plaintiffs themselves seem ambivalent about the size of the alleged enterprise. In their opposition, Plaintiffs again name the individuals that comprise the "enterprise," but this time they omit Sandeep and Rigoberto, the two names that they added in their FAC. Opp. at 12.

The features of a RICO enterprise must be pled as "specific facts, not mere conclusory allegations." *Elliot v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989). Plaintiffs have asserted the existence of an ongoing organization, but they have not pled its existence with sufficient facts.

**SANCTIONS**

In granting the first motion to dismiss, the Court warned Plaintiffs that they could be sanctioned if they re-pleaded unsupported claims or violated this Court's order. Order 23:6-7; 28 U.S.C. § 1927, Fed. R. Civ. P. 11. In their motions to dismiss, both sets of defendants now request sanctions. The Chandis request $8,125.89. The other Defendants request $9,450.

While the Court agrees that the FAC was voluminous, repetitious, and largely unsupported, the Court cannot say that this filing crossed the line of "so multipl[ying] the proceedings ... unreasonably and vexatiously" or of violating Rule 11. The Court denies these requests.

**CONCLUSION AND ORDER**

For the reasons discussed above, the RICO claim is dismissed with prejudice. Absent this claim, there is no basis for federal jurisdiction. The Court GRANTS the motions to dismiss the FAC with prejudice. This Court DIRECTS the clerk to enter judgment in favor of Defendants and against Plaintiffs and to close this action.

IT IS SO ORDERED.

Dated: **August 29, 2013**     **/s/ Lawrence J. O'Neill**
                               UNITED STATES DISTRICT JUDGE